UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| INTERNATIONAL-MATEX TANK TERMINALS<br><br>  Plaintiff<br><br>VERSUS<br><br>TRAFIGURA AG, INC.,<br>SHELL CHEMICAL, LP and<br>SHELL TRADING (US) COMPANY<br><br>  Defendants | C.A. NO.:<br><br>SECTION : "         "<br><br>JUDGE:<br><br>MAGISTRATE: "         " |

## ORIGINAL COMPLAINT OF
## <u>INTERNATIONAL-MATEX TANK TERMINALS</u>

**NOW INTO COURT,** through undersigned counsel, comes plaintiff, International-Matex Tank Terminals ("IMTT" or "Plaintiff"), who hereby brings causes of action in contract, tort, maritime contract, general maritime law negligence and pursuant to the Louisiana Products Liability Act, LSA-R.S. 9:2800.51, et seq., against TRAFIGURA AG, INC. ("Trafigura"), SHELL TRADING (US) COMPANY ("Shell Trading") AND SHELL CHEMICAL, LP ("Shell Chemical") as follows:

## **JURISDICTION**

1.

This action is filed pursuant to 28 U.S.C. §1332 based on complete diversity of citizenship (as set forth below) and because the amount in dispute exceeds $75,000.

2.

This Court also has jurisdiction over the claims against Trafigura pursuant to 28 U.S.C. §1333 on the basis of a maritime contract between IMTT and Trafigura and general maritime law negligence claims against Trafigura, Shell Trading and Shell Chemical.

3.

This court also has supplemental jurisdiction over the claims against Shell Chemical and Shell Trading pursuant to 28 U.S.C. §1367(a) as those claims are so related to the §1333 maritime contract and maritime negligence claims against Trafigura so as to form part of the same case or controversy under Article III of the United States Constitution.

**VENUE**

4.

Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the action occurred at plaintiff's tank terminal facility in St. Charles Parish, State of Louisiana, which is also where the damaged property which is the subject of this action is located.

**PARTIES**

5.

Plaintiff, International-Matex Tank Terminals is a Delaware general partnership. Its two partners are International Tank Terminals, LLC, a Louisiana limited liability company and ITT-Storage, Inc., a Louisiana "C" corporation.

6.

Made defendant herein is Trafigura AG, Inc., a corporation organized and existing by virtue of the laws of Switzerland with a domicile address of Toepferstasse 5, CH-6004, Luzern, Switzerland, doing and soliciting business in Louisiana within the jurisdiction of this Honorable Court, and with its principal place of business in Houston, Texas.

7.

Made defendant herein is Shell Trading (US) Company, a Delaware corporation with its principal place of business in Houston, Texas, authorized to do and doing business in Louisiana, within the jurisdiction of this Honorable Court.

8.

Made defendant herein is Shell Chemical, LP, a Delaware corporation with its principle place of business in Houston, Texas, authorized to do and doing business in Louisiana, within the jurisdiction of this Honorable Court.

Shell Chemical LP's shareholders are Shell Oil Company (which is incorporated in the State of Delaware, with its principal place of business in Houston, Texas) and SCOGI, GP.

SCOGI, GP is owned by Shell Oil Company (which is incorporated in the State of Delaware, with its principal place of business in Houston, Texas), Shell Offshore and Chemical Investments Inc., and SWEPI LP. Shell Offshore and Chemical Investments Inc. is incorporated in the State of Delaware, with its principal place of business in Houston, Texas.

SWEPI LP is owned by Shell US E & P Investments, LLC and Shell Energy Holding GP LLP. Shell US E & P Investments, LLC is incorporated in the State of Delaware, with its principal place of business in Houston, Texas.

Shell Energy Holding GP LLP is wholly owned by Shell US E &P Investments LLC, which is incorporated in the State of Delaware, with principal place of business in Houston, Texas.

**Factual Background**

9.

IMTT operates bulk liquid storage terminal facilities throughout North America, including St. Rose, Louisiana. IMTT's St. Rose facility uses specialized equipment and an intricate network of pipes, valves, pumps and other infrastructure to transport a wide variety of liquid products between vessels on the Mississippi River and IMTT's storage tanks ("IMTT St. Rose").

10.

At all material times, IMTT acted in its capacity as owner and operator of its St. Rose tank terminal facility pursuant to an Agreement of General Conditions between IMTT and Trafigura, validly executed in separate counterparts by IMTT on July 22, 2009 in New Orleans, Louisiana and by Trafigura on July 13, 2009 in Houston, Texas, as amended in writing on November 16, 2011 (hereinafter referred to as the "Master Storage Contract;" attached hereto as **Exhibit A**).

11.

IMTT adopts and pleads the entire contents of the Master Storage Contract as if copied herein verbatim and *in extenso*.

12.

Paragraph 19 of the Master Storage Contract requires that the laws of the State of Louisiana shall govern and apply to the terms of the agreement and the parties' performance thereof.

13.

At all material times, Trafigura acted in its capacity as Customer pursuant to the Master Storage Contract. The Master Storage Contract provided for the storage of Number

6 fuel oil ("6-oil") in certain IMTT-St. Rose tanks, including SR-501, a 500,000 barrel capacity tank dedicated for Trafigura's exclusive use during the contract term.

14.

Shell Chemical is the manufacturer of the product discharged into IMTT's St. Rose facility by the barge G-119 on or about March 25, 2012.

15.

At all material times, Shell Trading acted in its capacity as a blender, marketer and distributor of the product discharged into IMTT's St. Rose facility by the barge G-119 on or about March 25, 2012.

16.

Pursuant to the Master Storage Contract, Trafigura sent IMTT a discharge nomination on March 20, 2012 seeking to discharge approximately 20,000 barrels of product into IMTT's St. Rose facility from barge G-119.

17.

The March 20, 2012 discharge nomination indicated the product to be discharged corresponded with Material Safety Data Sheet ("MSDS") P-535; specifically, "Residual Marine Fuels, RMA-RMK" that falls into a category of products known as Number 6 fuel oil ("6-oil"). The MSDS indicated this product was manufactured by Chevron Marine Products.

18.

Relying on the MSDS information provided by Trafigura, which indicated the product to be discharged was 6-oil – a product included in Trafigura's storage contract – IMTT accepted discharge of the product from IMTT's dock no. 11 into its Shore Tank 501 ("SR-501") using dock line 4/24, a 24-inch un-insulated and un-heated line approximately 5,600 feet long. Line 4/24 is utilized for all IMTT 6-oil customers.

19.

Beginning in the early morning hours of March 24, 2012 when Trafigura's inspector approved the discharge, the barge G-119 attempted to pump the purported 6-oil into IMTT's dock line 4/24, which connected to shore tank SR-501; however, the barge's pumps had unusual difficulty pushing the product through the line. Ultimately, on or about March 25, 2012, approximately 5,600 feet of dock line 4/24 became plugged with the product, rendering a significant portion of IMTT's 6-oil handling system totally useless and unavailable to IMTT's numerous 6-oil customers.

20.

Due to the plugged line, IMTT marine dock no. 11 has been rendered unusable for IMTT's 6-oil customers, causing significant service disruption, additional costs and delays both internally for IMTT and for IMTT's customers.

21.

The limited amount of product that entered shore tank SR-501, estimated at 1,300 barrels, has solidified in the bottom of the tank. As a result, the tank cannot be emptied of product using conventional tank piping systems.

22.

Subsequent investigation revealed Trafigura misidentified the product it nominated into IMTT's St. Rose facility. The product on board the G-119 was not the purported 6-oil, but Blended Pyrolysis Pitch, MSDS No. 9980, manufactured by Shell Chemical. Upon information and belief, Blended Pyrolysis Pitch is blended with components to create a product pumpable at lower temperatures. Upon information and belief, this Blended Pyrolysis Pitch was, in fact, unblended pyrolysis pitch ("Unblended Pyrolysis Pitch").

23.

This Unblended Pyrolysis Pitch has different qualities and characteristics than 6-oil, which would require the use of different protocols and procedures at a tank terminal facility such as IMTT's St. Rose facility to prevent the product from damaging IMTT's facility and disrupting business operations.  In particular, Unblended Pyrolysis Pitch must be kept at a higher temperature to maintain the viscosity needed to pump the product through the tank terminal system without it solidifying in the line and tank.

24.

The un-insulated, un-heated dock line and SR-501 used for 6-oil service at IMTT's St. Rose facility is not designed for, nor capable of maintaining Unblended Pyrolysis Pitch at sufficiently high temperatures to keep the Unblended Pyrolysis Pitch in a liquid and pumpable state.

25.

In other words, Trafigura told IMTT it wanted to store a cargo of 6-oil in tank SR-501, but knew it was attempting to store Blended Pyrolysis Pitch, which is not permitted under the Master Storage Contract for 6-oil storage and is itself a breach of the contract and of Trafigura's warranties under the contract.  Further, upon information and belief, the product Trafigura purchased from Shell Trading and/or Shell Chemical had been improperly manufactured and was not properly blended.  As a result, the product separated and stratified on the barge G-119, resulting in pure or nearly pure Unblended Pyrolysis Pitch being pumped into IMTT's facility.  Prior to this incident, pure pitch had never been introduced into the IMTT-St. Rose facility because of the well-known problems and damage that can result.

26.

IMTT continues to utilize SR-501 in its damaged condition and has not emptied, cleaned or inspected SR-501 to determine the scope of the damage. As SR-501 is dedicated for Trafigura's exclusive use under the Master Storage Contract, the 500,000 barrel tank has remained in service, at Trafigura's request, and Trafigura continues to utilize the tank, accepting the diminished serviceability. However, it will become necessary to take SR-501 out of service in the future in order to fully evaluate the condition of the tank and perform any needed cleaning, modifications or repairs. This process would require sandblasting, jackhammering or using another method of removing the estimated 1,300 barrels of product from the tank floor. Ultimately, the entire tank floor may need to be removed and replaced. Paragraphs 11 of the Master Storage Contract authorizes IMTT to take storage tanks, including SR-501, out of service at any time to perform inspections, modifications or repairs, as needed. Because the damage at issue was caused by a breach of Trafigura's warranties under the Master Storage Contract, any rent and other charges to related to the affected tank would not be suspended.

27.

Further, in the event any inspections, modification or repairs are required pursuant to paragraph 11, Paragraph 12 of the Master Storage Contract requires Trafigura to clean the affected tank(s) and pipelines at Trafigura's expense and return same to IMTT clean, dry and odor free, in a proper condition to perform inspection. All product residue and waste shall be properly transported and disposed of. If Trafigura fails to honor this obligation, paragraph 12 further provides that IMTT may arrange for the cleaning of the tanks and pipelines and disposal of product residue and other waste on Trafigura's behalf, with Trafigura to pay IMTT's cost plus twenty percent (20%).

28.

Since the incident on or about March 25, 2012, IMTT has worked diligently with Trafigura, Shell Chemical, Shell Trading and certain engineering and pipeline heat tracing experts in pursuit of a solution to the plugged line. To date, IMTT has been unable to empty, clean, inspect and assess the full measure of damages to SR-501.

29.

Through these efforts, a potential solution for the pipeline has been identified that would involve testing and modifying dock line 4/24 to enable heating of the solidified Unblended Pyrolysis Pitch so it can be eliminated from the line at an estimated cost of approximately $3,317,399.00 (the lowest cost of several proposals and bids obtained). However, if the proposed modified-line solution is not successful, it may become necessary to replace the entire 5,600-foot dock line and related equipment, at an estimated cost of at least $6,000,000. To date, IMTT has not been able to assess the full measure of damages to SR-501, which remains in limited service.

30.

IMTT placed Trafigura, Shell Chemical and Shell Trading on notice that IMTT holds said defendants responsible for its damages and has kept said defendants regularly informed of progress as a solution is pursued. However, Trafigura, Shell Chemical and Shell Trading have refused to honor their obligations to pay the cost of remediation and other damages.

31.

As a direct result of the incident in suit and defendants' refusal to remediate dock line 4/24, several critical portions of IMTT's St. Rose facility remain out of use, including marine dock no. 11, resulting in continuing property damage, delays and economic loss for IMTT and its customers.

32.

As a direct result of the fault of Trafigura, Shell Chemical and/or Shell Trading, IMTT has sustained damages, in the following non-exclusive particulars:

a) Loss of use of several critical portions of IMTT's St. Rose facility, including but not limited to dock line 4/24 (unavailable to all IMTT customers) and marine dock no. 11 (unavailable to IMTT's 6-oil customers);

b) Property damage to IMTT's St. Rose facility, including but not limited to dock line 4/24 and shoretank SR-501;

c) Cost to test portions of IMTT's facility in pursuit of full and complete remediation to IMTT's damaged infrastructure;

d) Cost to modify portions of IMTT's facility in pursuit of full and complete remediation to IMTT's damaged infrastructure;

e) Cost to heat portions of IMTT's facility in pursuit of full and complete remediation to IMTT's damaged infrastructure;

f) Cost to clean portions of IMTT's facility in pursuit of full and complete remediation to IMTT's damaged infrastructure;

g) Cost to repair portions of IMTT's facility in pursuit of full and complete remediation to IMTT's damaged infrastructure;

h) Internal costs and time spent, including hundreds of man-hours by IMTT's engineering, operations, administrative, accounting and other departments;

i) Loss of opportunity;

j) Loss of reputation and goodwill;

k) Economic loss associated with the foregoing, in an amount to be proven at trial;

l) Legal fees, costs and expenses, including attorney's fees.

## COUNT 1: TRAFIGURA'S NEGLIGENCE and BREACH OF CONTRACT

33.

IMTT adopts, realleges and incorporates the preceding allegations of this Complaint for Damages as if copied herein verbatim and *in extenso*.

34.

Trafigura knew or should have known the product it sought to discharge was Unblended Pyrolysis Pitch and not 6-oil.

35.

Trafigura knew or should have known the product it nominated for discharge into IMTT's facility was not authorized under the Master Storage Contract.

36.

Trafigura intentionally concealed the true nature of the product in nominated for discharge into IMTT's facility.

37.

Trafigura knew or should have known discharging products other than 6-oil, including Blended or Unblended Pyrolysis Pitch, into dock line 4/24 and/or shore tank SR-501 would cause severe property damage, including but not limited to the plugged lines and shore tank, and cause severe economic loss to IMTT.

38.

Trafigura breached paragraph 2 of the Master Storage Contract, which required Trafigura to "inspect all storage tanks, pipelines and related infrastructure used to store and move Products to determine compatibility and suitability with Products prior to storage and movement."

39.

Trafigura breached paragraph 3 of the Master Storage Contract, which provides that "[Trafigura] must deliver to IMTT a Material Safety Data Sheet ("MSDS") accurately describing each Product delivered to IMTT forty-eight (48) hours before estimated time of arrival," and also requires Trafigura to complete and deliver to IMTT a Customer Product Representation ("CPR") form prior to IMTT receiving any Product at the facility.

40.

Pursuant to paragraph 3 of the Master Storage Contract, Trafigura "warrant[ied] to IMTT that all MSDS(s) and CPR(s) submitted to IMTT are accurate and correct as to each parcel or shipment of Product received by IMTT and that all Products comply with applicable Laws."

41.

Trafigura further breached paragraph 3 of the Master Storage Contract because the Product at issue did not "conform to the generally accepted specifications for the type of Product identified in the Schedule."

42.

Trafigura further breached paragraph 3 of the Master Storage Contract, which requires Trafigura to remove the non-conforming product from IMTT's facility within a reasonable time after being notified by IMTT, at Trafigura's own cost and expense.

43.

Under paragraph 3 of the Master Storage Contract, IMTT is entitled to dispose of the non-conforming product at Trafigura's cost and IMTT shall not be responsible for any loss or damage including demurrage or other charges resulting from actions taken in response to the introduction of non-conforming product.

44.

Trafigura further breached paragraph 3 of the Master Storage Contract, which requires Trafigura to provide written notice of "Special Handling" prior to execution of the Master Storage Contract, if possible, but in all cases prior to delivery of any products requiring "special handling, blending, heat or other treatment." Trafigura was further required under paragraph 3 to warrant that such notice of Special Handling is accurate and in compliance with all Laws.

45.

Trafigura's negligence and breach of contract were the sole and/or contributing cause of plaintiff's damages sued upon herein.

## COUNT 2: LOUISIANA PRODUCT'S LIABILITY ACT CLAIMS AGAINST SHELL

46.

IMTT adopts, realleges and incorporates the preceding allegations of this Complaint for Damages as if copied herein verbatim and *in extenso*.

47.

Upon information and belief, Shell Chemical and/or Shell Trading (collectively "the Shell entities") manufactured the purported Blended Pyrolysis Pitch at issue or held themselves out as the manufacturer.

48.

Shell Trading admitted to IMTT that the Shell entities improperly manufactured the product at issue by improperly blending it.

49.

Upon information and belief, the purported Blended Pyrolysis Pitch at issue was unreasonably dangerous in construction or composition because, at the time the product left

13

the manufacturer's control, the product deviated in a material way from the manufacturer's specification or performance standards for the product or from otherwise identical products manufactured by the Shell entities. Without limitation, this allegation includes but is not limited to the fact the product at issue was improperly blended so as to allow separation and stratification during transit or storage.

50.

Upon information and belief, the purported Blended Pyrolysis Pitch at issue was unreasonably dangerous by virtue of breach of an express warranty inasmuch as the product failed to comply with a representation, statement of alleged fact or promise about the product or its nature, material or workmanship that represented, affirmed or promised that the product or its nature, material or workmanship possessed specified characteristics or qualities or would meet a specified level of performance. Without limitation, this allegation includes but is not limited to the fact that MSDS information provided by the Shell entities constituted an express warranty regarding the nature, characteristics and qualities of the purported Blended Pyrolysis Pitch and constituted a representation of a specified level of performance expected of the product.

51.

Upon information and belief, the purported Blended Pyrolysis Pitch at issue was unreasonably dangerous because it failed to provide an adequate warning inasmuch as, at the time the product left the manufacturer's control, the product possessed a characteristic that might cause damage and the Shell entities failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product. Without limitation, this allegation includes but is not limited to the Shell entities' failure to provide accurate MSDS information, failure to warn Trafigura and others about the

14

dangers and risks associated with pure pitch, and the potential risk of product separation and stratification.

52.

IMTT did not know and could not be reasonably expected to know of the characteristic of the product that might cause the damage and the danger of such characteristic.

53.

The purported Blended Pyrolysis Pitch at issue was unreasonably dangerous because (1) there existed an alternative design for the product that was capable of preventing the claimant's damage; and (2) the likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product.  Without limitation, this allegation includes but is not limited to the fact the product at issue could have been properly blended so as to prevent separation and stratification during transit or storage.

54.

Shell Chemical and/or Shell Trading are thus liable to IMTT for all its damages under the Louisiana Products Liability Act, La.Rev.Stat. Ann. § 9:2800.51, *et seq*.

### COUNT 3: NEGLIGENCE AGAINST SHELL

55.

IMTT adopts, realleges and incorporates the preceding allegations of this Complaint for Damages as if copied herein verbatim and *in extenso*.

56.

Alternatively, IMTT's damages were caused by the sole or contributory fault of Shell Chemical and/or Shell Trading by virtue the negligence of employee, agent, representative

or other person for whom Shell Chemical and/or Shell Trading are legally responsible when that person improperly identified, used, handled, blended, transported, stored, managed and/or labeled the product at issue.

57.

Plaintiff reserves the right to supplement and amend this Complaint as appropriate throughout discovery, as limited facts are currently available regarding the specific roles of Shell Chemical and Shell Trading, the Shell entities' transaction(s) with Trafigura and the process by which the product at issue was manufactured and distributed.

### COUNT 4: ATTORNEY'S FEES, COSTS AND EXPENSES

58.

IMTT adopts, realleges and incorporates the preceding allegations of this Complaint for Damages as if copied herein verbatim and *in extenso*.

59.

IMTT unsuccessfully sought defendants' voluntary compliance with their obligations under the law and pursuant to contract.  Defendants' persistent failure and refusal to honor these obligations damaged plaintiff's business and property.  The defendants have failed to make plaintiff whole for these damages, necessitating the hiring of an attorney.  Therefore, Trafigura is liable to IMTT for all of IMTT's attorney's fees, costs and expenses incurred enforcing IMTT's rights under the Master Storage Contract pursuant to paragraph 7 of said contract.

**WHEREFORE**, plaintiff, IMTT, respectfully prays that defendants Trafigura, Shell Chemical and Shell Trading be served with this Complaint for Damages, and that after due proceedings are hears, a judgment be rendered in favor of IMTT against defendants as reasonable under the premises, including attorney's fees, expert fees, and all costs and

expenses of these proceedings, along with judicial interest thereon from the date of demand until paid.

                Respectfully submitted:

                **DUNCAN & SEVIN, L.L.C.**

                */s/ Elton F. Duncan III*
                _____

                **ELTON F. DUNCAN, III (LA 14967)**
                **KELLEY A. SEVIN (LA 25871)**
                **HARRY MORSE (LA 31515)**
                **CHARLES E. ROTHERMEL (LA 34068)**
                400 Poydras Street, Suite 1200
                New Orleans, LA  70130
                Telephone: (504) 524-5566
                Facsimile: (504) 524-9003
                E-mail: eduncan@duncansevin.com
                E-mail: ksevin@duncansevin.com
                E-mail: hmorse@duncansevin.com
                E-mail: crothermel@duncansevin.com
                Attorneys for Plaintiff, International-Matex Tank Terminals

**PLEASE SERVE:**

**TRAFIGURA AG, INC.**
*Through its registered agent:*
National Registered Agents, Inc.
5615 Corporate Blvd., Ste. 4008
Baton Rouge, LA 70808

**SHELL CHEMICAL LP**
*Through its registered agent:*
C T Corporation System
5615 Corporate Blvd., Ste. 4008
Baton Rouge, LA 70808

**SHELL TRADING (US) COMPANY**
*Through its registered agent:*
C T Corporation System
5615 Corporate Blvd., Ste. 4008
Baton Rouge, LA 70808